NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr><td>THOMAS PARKER,</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Plaintiff,</td><td>:</td><td>**Hon. Dennis M. Cavanaugh**</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>v.</td><td>:</td><td>**OPINION**</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>ROY L. HENDRICKS, et al.,</td><td>:</td><td>Civil Action No. 03-cv-914 (DMC)</td></tr>
<tr><td></td><td>:</td><td></td></tr>
<tr><td>Defendants.</td><td>:</td><td></td></tr>
<tr><td></td><td>:</td><td></td></tr>
</table>

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>:

This matter comes before the Court upon motion for reconsideration of Petitioner Thomas Parker ("Petitioner").  Petitioner asks this Court to reconsider its decision of August 21, 2009 denying his petition for *habeas corpus*.  Pursuant to Fed. R. Civ. P. 78, no oral argument was heard. After carefully considering the submissions of the parties and based upon the following, it is the finding of the Court that Petitioner's motion for reconsideration is **denied**.  The Court will issue this Opinion as a supplement to the prior Opinion issued on August 19, 2009.

## I.  <u>BACKGROUND</u>[1]

### A.    **Factual Background**

Petitioner along with Rashaun Barkley and Syeme Cobb, on January 15, 1993, stole Dr. Ruby Samson's gray Acura and drove it to an abandoned lot. She later reported the car stolen. A few hours later, early in the morning of January 16, 1993, Tanji Hyman drove his father's white Mazda RX-7

---

[1] The facts in the Background section have been taken from the parties' submissions.

to a bar in Irvington. He noticed that the vehicle was gone when he left the bar two hours later. Hyman reported the car stolen. On his way to the lot to see if the car had been towed, Hyman saw his Mazda and an Acura. Hyman followed the cars, but Hyman could not keep up with the vehicles and eventually lost track of them.

Early in the morning of January 16th, Philissa James and her friend left a diner in East Orange. As they left, they saw a black Acura pulling up with three men in the car. The trio had started to pull on hoodies. The front passenger exited, yelled, "Don't run b[____], I'll kill you" and then dragged James down the diner steps, threatening, "B[____], I'll kill you." The man took her leather coat and returned to the car. James had her keys, a $100 bill, food stamps and a car repair receipt in the jacket.

At around 2:00 a.m., Ontario Waterman and Dennis Spruill were outside Club Little Shields in Newark when they saw the petitioner and two others in a gray Acura. Between 2:00 a.m. and 2:30 a.m., Phillisa Lewis, her brother, Rajhan Lewis, as well as their cousin Michael Lewis and their friend, Mary Williams, went to a club in Irvington. They stayed for about fifteen minutes and walked to their car. Phillisa and Rajhan Lewis saw a black car with a beige interior. The passenger door opened and Phillisa Lewis saw a gun pointed at her and heard the man say, "give it up." Rajhan Lewis recognized the gun as a nine millimeter semi-automatic. Phillisa Lewis told her brother to take off his coat, which he then gave to the man. The car took off. Then, the car backed up and someone asked the Lewises for money. When they said they had none, the men drove off. Rajhon was able to read part of the license plate number of the car, GP_79H.

At approximately 3:00 a.m., Bunny Burt and her friend, Shelia Rodriguez, both wearing leather coats, left a club in Newark. Rodriguez saw two vehicles run a stop light. A black, four door car began to follow them. Believing the people in the vehicle wanted to speak with her, Burt stopped her car, a red Toyota. The black car contained three men wearing black hoodies and masks over their mouths. Burt said, "Shelia, he's got a gun." Burt immediately put her car in reverse in order to flee.

-2-

Rodriguez ducked under the dashboard.  The black car followed, hitting Burt's car several times. Burt continued to flee and finally stopped the car near the YMCA and the old Hahne's department store.  The black car pulled up to the driver's side.  The passenger of the black car got out and Rodriguez heard a single gunshot, which shattered the driver's side glass window.  Burt stated, "Shelia, I am shot" and then she fell on Rodriguez and died.  Rodriguez ran across the street to the Robert Treat Hotel for help.  A security guard checked inside Burt's car and then notified the police. A resident at the YMCA observed Burt's red car and a black car alongside it.  He also saw the front passenger exit the black car, pull something from his waist and fire into the driver's side window of the red car.

A police officer, at approximately 3:45 a.m. went to Weequahic Park on a report of a car in the water.  He discovered a gray Acura with the license plate number GPG-79H in the water.   Two off-duty police officers, Dwayne Harris and Tracey Bowers, were leaving a club in East Orange at approximately 3:45 a.m. when they saw a Mazda RX-7 pull up besides them.  Harris saw a nine millimeter handgun pointed from the vehicle's front passenger side window and heard two voices say, "that's them, there they go."  Bowers began to run after the gun was pointed at his stomach, while Harris took cover behind a car.  Two gunshots were fired, and the Mazda drove off.  The police were contacted.

Officers Lawrence Flanagan and William Butler heard the dispatch and unsuccessfully chased after the Mazda. Meanwhile, near Weequahic High School, these two officers saw a black Maxima, the petitioner's car, pull up.  They stopped the Maxima. Barkley, Cobb and Alfuquan Maing were in the car. Several jackets were in the back seat of the car.

At trial, Cobb and Maing testified that they saw the petitioner and Florence driving the white Mazda RX-7 and being pursued by the police.  Right after the Mazda raced by, Cobb, Maing and Barkley got in the petitioner's car to follow.

The Maxima had no damage consistent with hitting a red car.  On January 18th, the Lewises

contacted the police.  Rajahn identified one of the recovered jackets as his. Both said that the Maxima was not the vehicle used in the robbery.

Investigator Frank Racioppi processed the Acura and found damage to the front headlight, streaks of red paint on it, damage to the front hood, a punched out ignition and damage to the rear quarter panel.  Racioppi also found several shoe impressions on the hood of the car.

On January 19th, after meeting with law enforcement a few times, Maing told Investigator William Isetts that Petitioner had admitted to hitting the car with two girls in it and pointed a gun at them.  Petitioner told Maing that the girls backed their car up, and Florence, who was driving, pushed the girls' car with his.  The girls' car eventually got a flat tire and the petitioner said he shot the girls' car's driver's side window, ran to get the leather coats, but backed off when he saw one of the girls' eyes roll back.

Meanwhile, James gave a statement and then met with Isetts. James identified items stolen from her car.  James also identified the petitioner's photo as "looking like the guy" by his mouth, eyes and skin color.  Isetts then obtained a warrant for the petitioner's arrest.  Police went to the petitioner's sister's apartment where they found the petitioner hiding under a pile of clothes.

Search warrants were executed for the homes of the petitioner, Florence and Barkley. Officers seized the petitioner's boots although they were not listed on the search warrant as, at that time, they had no evidence linking the petitioner's boots to either the robberies or the homicide.  A second warrant was executed at the petitioner's home after information about the footprint on the hood of the Acura was discovered.  With the second warrant, the police seized additional pairs of boots. Joyce Polyniak, a forensic scientist, examined the boots seized and compared them to the footprint on the car hood.  The footprint on the car hood was consistent with one of the petitioner's boots. Paint specimens from the Acura matched the paint from Burt's car.

Petitioner was found guilty of first-degree felony murder, first-degree robbery, second-degree robbery, second-degree conspiracy to commit robbery, two counts of second-degree possession of

a firearm with an unlawful purpose, simple assault, three counts of third-degree theft, and two counts of the unlawful possession of a firearm without a permit. Petitioner was sentenced to 45 years to life.

### B.   Procedural Background

On October 22, 1993, in the New Jersey Superior Court of Essex County, Petitioner was convicted of a series of crimes including conspiracy to commit robbery, felony murder, first degree robbery, possession of a weapon, receiving stolen property, aggravated assault, possession of weapon for an unlawful purpose, theft (auto), and purposeful and knowing murder. He was sentenced to 45 years to life on November 18, 1993. On August 8, 1994 Petitioner filed a notice of appeal from these convictions. The New Jersey Appellate Division affirmed the conviction and sentence on February 10, 1997. On October 28, 1998, Petitioner filed a petition for post-conviction relief. After hearings were held in January and March 2000, before the Honorable Theodore A. Winard, the petition was denied. Petitioner filed a notice of appeal on June 15, 2000. The New Jersey Appellate Division affirmed the lower court's decision.

Between the years of 1999 and 2004, six of the witnesses who had previously testified against Petitioner in his 1993 trial, submitted recanting affidavits to the Superior Court in Essex County. As a result, on May 21, 2001, Petitioner submitted to the trial court a motion for a new trial based on newly discovered evidence. Evidentiary hearings were held on October 27-28, 2004, and December 14, 2004. Upon hearing the testimonies of four of the six available recanting witnesses, the trial court Judge denied Petitioner's motion for a new trial on February 2, 2005. A motion for reconsideration was filed on March 7, 2005, and was denied on November 10, 2005. During this period, Petitioner filed a writ of *habeas corpus* on March 7, 2003. On August 2, 2005, Petitioner filed a motion to stay his petition for writ of *habeas corpus* until he exhausted all of his state remedies. The District Court granted his stay. Thereafter, on December 22, 2005, Petitioner filed a notice of appeal to the Appellate Division. On August 26, 2008 the New Jersey Appellate Division affirmed the Law Division's decision denying a new trial.

-5-

On December 17, 2008, following Petitioner's exhaustion of his state remedies, Petitioner filed a motion with this Court to re-open his case. Petitioner's request was granted on January 22, 2009. Petitioner filed a supplement to his application for a writ of *habeas corpus* on December 17, 2008. Respondents filed an Answer on March 20, 2009. In response, Petitioner submitted a Traverse on April 1, 2009. On April 8, 2009, Petitioner filed a motion to compel the production of documents. On April 27, 2009 and May 7, 2009, Petitioner filed a motion for an evidentiary hearing and a motion requesting "admissions in lieu of a more formal motion on petition for habeas corpus" relief. On May 19, 2009, Respondents filed a letter in opposition to Petitioner's requests for an evidentiary hearing and admissions. On August 19, 2009, the Court denied Petitioner's petition for a writ of *habeas corpus* as well as his motion to compel documents, request for an evidentiary hearing, and request for admissions. On August 27, 2009, Petition moved for reconsideration of this Court's decision denying his petition for *habeas corpus*. This Opinion followed.

## II. <u>APPLICABLE LAW</u>

### A. Standard for Reconsideration

Motions for reconsideration are governed by L. Civ. R. 7.1(i). <u>See</u> <u>U.S. v. Compaction Sys. Corp.</u>, 88 F. Supp. 2d 339, 345 (D.N.J. 1999). A motion pursuant to Local Rule 7.1(i) may be granted if (1) an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice. <u>Database Am., Inc. v. Bellsouth Adver. & Pub. Corp.</u>, 825 F. Supp. 1216, 1220 (D.N.J. 1993). Such relief is "an extraordinary remedy" that is to be granted "very sparingly." <u>See</u> <u>NL Indus. Inc. v. Commercial Union Ins. Co.</u>, 935 F. Supp. 513, 516 (D.N.J. 1996). Local Rule 7.1(i) does not contemplate a recapitulation of arguments considered by the Court before rendering its original decision. <u>See</u> <u>Bermingham v. Sony Corp. Of Am., Inc.</u>, 820 F. Supp. 834, 856 (D.N.J. 1992), <u>aff'd</u>, 37 F.3d 1485 (3d Cir. 1994). In other words, a motion for reconsideration is not an

appeal.  It is improper on a motion for reconsideration to "ask the court to rethink what it ha[s] already thought through." Oritani Sav. & Loan Ass'n v. Fidelity & Deposit Co., 744 F. Supp. 1311, 1314 (D.N.J. 1990).

**B.  Standard for Habeas Review**

A district court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §2254(a). Accordingly, a writ may be granted if the state court's decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), limits a federal court's authority to grant habeas relief when a state court has adjudicated petitioner's federal claim on the merits. See 28 U.S.C. § 2254(d). Where a federal claim was "adjudicated on the merits" in state court proceedings, the writ must be denied unless adjudication of the claim either involved an unreasonable application of clearly established federal law, or was based on unreasonable determination of the facts in light of the evidence before the state court. See 28 U.S.C. § 2254(d).  Specifically, § 2254(d) provides:

> (d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State Court proceedings unless the adjudication of the claim -
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Accordingly, this Court may not grant habeas relief to Petitioner unless the adjudication of a federal claim by the New Jersey courts involved an unreasonable application of clearly established Supreme Court law, see 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding and petitioner is in custody in violation of the Constitution or laws or treaties of the United States, see 28 U.S.C. §§ 2254(a), (d)(2).

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  A court, therefore must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1), if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.

In addition, whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.  Id. at 409-10; see also Thomas v. Varner, 428 F. 3d 491, 497 (3d Cir. 2005).  "[T]his Court has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  See Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) (citing Wright v. Van Patten, 552 U.S. at 125-26).

### III. **ANALYSIS**

Plaintiff argues that the Court improperly overlooked a number of his arguments in its Opinion of August 27, 2009, denying his petition for *habeas corpus*.

Plaintiff asserted that he was entitled to *habeas* relief because his conviction was tainted by a number of factors.  This Court issued an Opinion denying his petition.  Plaintiff, in his motion to reconsider argues that the Court improperly overlooked 11 of his seventeen arguments, namely that:

(1)   Phillisa James's identification of Petitioner as the culprit was based upon an impermissibly suggestive photo array;

(2)   evidence of the petitioner's prior possession of a nine millimeter handgun was impermissibly admitted;

(3)   the limitation on defense counsel's cross-examination of Investigator William Isetts was improper;

(4)   the prosecutor made inappropriate comments during his summations;

(5)   the jury came to inconsistent verdicts;

(6)   the sentence imposed by defendant was excessive and should be reduced;

(7 )  the conviction was obtained by the trial court's incorrect evaluation of the factors which are relevant to the reliability of prior inconsistent statements;

(8)   the conviction was obtained by counsel's failure to suppress illegally seized boots;

(9)   the conviction was obtained by counsel's failure to object to the testimony of the state's forensic chemist as being beyond allowable lay opinion;

(10)  the conviction was obtained by counsel's failure to make any investigation of potential witnesses;

(11)  the conviction was obtained by trial counsel's failure to request for instructions as to

the lesser included offenses of aggravated manslaughter and/or manslaughter.[2]

Petitioner, here, asserts that the Court failed to consider the above-enumerated arguments. Although a Court is entitled to determine what points are necessary to consider in its written opinion, in the interest of completeness, the Court issues this Opinion as a supplement to its previous Opinion denying *habeas* relief.   As this Opinion does not change the result of the Court's previous determination, reconsideration is denied.

## A.  Evidentiary Rulings

Among Petitioner's numerous arguments in support of his *habeas corpus* petition, he asserts that the trial court made a number of improper evidentiary rulings.

Generally, evidentiary errors "are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant of fundamental fairness in his criminal trial."  Bisaccia v. Attorney General of New Jersey, 623 F.2d 307, 312 (3rd Cir. 1980), cert. den., 499 U.S. 1042 (1980); Kontakis v. Beyer, 19 F.3d 110, 117 (3rd Cir. 1994), cert. den., 513 U.S.  The Supreme Court of the United States has long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" such as evidentiary issues.  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  A federal

---

[2] Of the seventeen (17) arguments Petitioner initially raised, he requested that several of his arguments be disregarded.  See Petitioner Supp. Motion For Reconsideration, at 3.  Petitioner asked the Court not to consider the following arguments (numbered 7, 9, 11, 13, 16) in addressing his petition:  the conviction was obtained as a result of defense counsels failure to challenge the indictment; the conviction was obtained by defects in the charge of accomplice liability and felony murder; the conviction was obtained by counsel's failure to object to the introduction of a ski mask offered as "similar" to the one alleged to have been worn by the defendant; counsel failed to call his expert witness to give rebuttal testimony; the conviction was obtained as a result of trial counsel's failure to object to third party hearsay provided by Syhim Cobb.  Petitioner also asserted summarily that an evidentiary hearing was required for defendant to prove that he was denied the effective assistance of both trial and appellate counsel (argument numbered 12).  Accordingly, of Plaintiff's 17 arguments, the Court need only consider the eleven remaining arguments.  See Petitioner's Br. At 5.

court's role is limited to determining whether admitting the evidence at issue violated the petitioner's right to due process and a fair trial.  Id.  For a trial to be deemed fundamentally unfair, it must be shown by a reasonable probability that the outcome would have been different without the evidence (i.e., that the result was unreliable because of such evidence).  Lockhart v. Fretwell, 506 U.S. 364, 370 (1993).

With these principles in mind, the Court will consider each of Petitioner's various arguments regarding the trial court's evidentiary rulings.

1.    Phillisa James's identification of Petitioner as the culprit

Petitioner argues that the police photo array was  impermissibly suggestive.  Petitioner asserts, then, that Ms. James' identification of him as the perpetrator was tainted and improper.

The trial court "found that the array consisted of six photographs of young, black males who have very similar facial characteristics, and sizes of their face[s]."  Respondent's Br. at 16. Petitioner contends that the photo of him was somehow significantly different from the rest because he has a black jacket and a hood on in the photo.  First, the Court disagrees that the photo array sets him apart from the other individuals in any significant way.  Second, Petitioner's observations regarding the hood/jacket are inapposite, as Ms. James' specifically said that the photograph of the petitioner "looked like the guy" who took her coat, **based on his "[s]mall, squinty like slanted eyes" and his mouth**—i.e., her identification was not based upon the apparel of the various individuals.  Res. Br. at 16.  Moreover, Ms. James' identification was later substantiated by her in-court identification of Petitioner.  Id.  She, again, asserted that her identification was based upon the petitioner's squinty eyes and skin color.  Id.

The Court finds that there was "no prejudice in the manner of presentation" in the photo array, and nothing to indicate that "the suspect's picture [wa]s so different from the rest that it suggest[ed] culpability."  Reese v. Fulcomer, 946 F.2d 247, 260 (3rd Cir. 1991), cert. den., 503 U.S. 988 (1992).  As Ms. James explained, she "could see [the assailant's] chin, mouth, eyes and part of

his nose." Based upon these features, she properly identified petitioner.

Petitioner's argument with respect to Ms. James' identification is without merit.

2. Evidence of the petitioner's prior possession of a nine millimeter handgun

Petitioner alleges that evidence as to his possession of a gun constitutes prejudicial "other-bad-act evidence." Res. Br. at 17.

Alfuquan Maing testified that he knew that a nine millimeter gun was used in the Burt robbery and killing. Maing also testified that he saw Petitioner with a nine millimeter gun a week before the January 16, 1993 incident. Such testimony was relevant here because Lewis, one of the robbery victims, testified that he and his sister, cousin and friend were accosted by an individual bearing a nine millimeter handgun. Moreover, ammunition from a nine-millimeter gun was recovered at the scene of the killing of Bunny Burt. The testimony regarding Petitioner's possession of a nine millimeter gun, therefore, connects him to the crimes.

Such evidence does not constitute "bad act" or "other crimes" evidence because "evidence that a defendant possessed a handgun is not itself a crime and probably does not fall within the realm of a civil wrong." Carswell, 303 N.J. Super. 462, 470 (App. Div. 1997). In Carswell, the Court found that the "State's witnesses were properly allowed to testify that the defendant was known to carry a gun and had been seen carrying the gun in question on other occasions [because] the testimony was introduced to tie the gun which was found at the scene of the crime to defendant." Id. at 471. The Court went on to explain that "the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice to the defendant because, in order to prove its case, the State needed to establish that the gun was in the possession of defendant on the date in question." Id.; see also Wilson v. Cathel, 2006 U.S. Dist. LEXIS 92345 (D.N.J. 2006, Dec. 21, 2006). Similarly, here, the probative value of the testimony was not outweighed by the prejudicial effect on Petitioner.

-12-

Evidence that Petitioner recently possessed a handgun—the type of handgun used to commit the crimes-in-issue—was properly admitted evidence.

        3.      The alleged limitation on defense counsel's cross-examination of Investigator William Isetts

Petitioner takes issue with the trial court's decision to bar defense counsel from asking Investigator Isetts (on cross-examination) as to why Maing was charged with perjury but Cobb was not.

As a general matter, the scope of cross-examination is left to the trial court's sound discretion. United States v. Irizarry, 341 F.3d 273, 306 (3rd Cir. 2003). The trial court prevented petitioner's lawyer from questioning Isetts about the perjury charge decision-making process (i.e., why one of the adverse witness was charged and the other was not).[3] This was proper for a number of reasons. First, as stated below, the jury has the sole responsibility to make credibility determinations. If the court permitted Petitioner to cross-examine Isetts in the manner proposed, the State's decision-making as to who was charged with perjury—effectively the State's credibility or determination—would be intruding upon the province of the jury. That is, Isetts would be opining as to witness credibility if the defense had been allowed to ask him the reasons for the State charging decisions regarding Cobb and Maing. Second, and more importantly, Isetts did not have the authority to make the decision as to whether to charge witnesses with perjury. As such, even if the trial court did permit evidence with respect to the Government's perjury charges, Isetts would not even be a competent source of the sought after information.

For the reasons states, the trial court limitation on the scope of Petitioner's cross-examination of Isetts was well within its sound discretion. Irizarry, 341 F.3d at 306.

––––––––––––––––––––

[3] Here, the trial court permitted Petitioner's counsel to question Cobb about the threat of being charged with perjury.

4.     The trial court's incorrect evaluation of the factors which are relevant to the
reliability of prior inconsistent statements

Some of the Government's witnesses—specifically Ontario Waterman, Dennis Spruill, Alfuquan Maing, and Syeme Cobb—gave testimony that was different from what they had told the police in their sworn, signed statements.  Petitioner asserts that the admission of such statements was impermissible.  This Court does not agree.

Waterman, in his initial signed statement, "disclosed that he saw the petitioner and two other people drive to Club Little Shields in the Acura."  He later denied that part of his statement.

Spruill, who was also at Club Little Shields, also testified inconsistently with his sworn, signed statement to the police with respect to the color of the Acura and where the petitioner was seated in his car.  He stated that Waterman told him Petitioner was in the car, which conflicted with his initial statement.

The trial court ruled that both Spruill's and Waterman's statements could be admitted into evidence.  The Court noted that neither individual was in custody at the time of the statements, and they did not attempt to exculpate themselves in any manner.

Maing in his signed, sworn statement disclosed that Petitioner told him that he killed the woman driving the Toyota. Maing also revealed that Petitioner told him that he was aware, before the shooting, that the women in the Toyota had leather coats. Petitioner additionally told Maing that he robbed a man in Irvington of his jacket as well as a woman in East Orange of her coat. Petitioner told Maing that, when he was in the car, he was seated in the front passenger side.  Maing at trial denied that the petitioner made these admissions.

The trial court ruled that Maing's statement could be admitted as substantive evidence.  It found that the police did not deem Maing a suspect when he was released after his first apprehension or at the time he gave his statement.  This lessened his motivation to lie.  Maing voluntarily went to the police to give his statement.  The trial court also noted that Maing was not informed of the details

-14-

of the homicide and the police did not pressure or encourage Maing to make his statement. The trial court also observed that Maing's statement was corroborated by other evidence.

Cobb initially gave inconsistent testimony and was shown his prior sworn statement about Petitioner's admissions regarding the robberies and shooting and the disposal of the car in the park. Cobb's statement was not admitted into evidence because he, on redirect examination, disavowed his recantation.  Since Cobb in his statement disclosed that the petitioner made these admissions to him, his testimony about the petitioner's admissions was not hearsay, as the petitioner claims.  The prior inconsistent statements were given under circumstances ensuring their reliability and were properly used by the jury as substantive evidence.

A witness's prior inconsistent statement is admissible if it is made under circumstances establishing its reliability and given under oath.  N.J.R.E. 803a(1); State v. Anthony Gross, 121 N.J. 1, 8-9 (1990), aff'd, 216 N.J. Super. 98, 108-9 (App. Div. 1987); State v. Frank Gross, 121 N.J. 18, 29 (1990).   In making that determination, the trial judge is directed to apply the following "relevant factors":

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion of the summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.

Anthony Gross, 121 N.J. at 10.[4]   In light of these criteria, the trial judge in this case properly

_____

[4] Pursuant to N.J.R.E. 803, the following types of statements are not excluded by the hearsay rule:

permitted the evidence to be admitted.

This Court finds no error in the trial court's rulings.  In <u>State v. Swint</u>, the defendants, on appeal, argued "that the trial judge incorrectly allowed the State to introduce evidence of [a witness'] prior inconsistent statement."  328 N.J. Super. 236, 254 (App.Div. 2000).  At trial, the witness "recanted the statement he gave to the police, contending that it was physically coerced."  <u>Id.</u>  The trial judge, however, concluded that given the circumstances in which the prior statement was made, it was sufficiently reliable, and therefore, admissible.  The Appellate Division affirmed, and explained that "we are constrained to defer to the trial court's credibility determinations that are often influenced by observations of the character and demeanor of witnesses which cannot be transmitted by a dry record."  <u>Id.</u>  (citing <u>State v. Locurto</u>, 157 N.J. 463, 474 (1999)).  Similarly, in <u>State v. Mancine</u>, the Appellate Division determined that the trial court was proper in permitting a witness' prior inconsistent statement to be admitted as substantive evidence of defendant's guilt, notwithstanding the fact that the witness recanted her testimony at trial.  <u>See</u> 124 N.J. 232, 245-49 (1991).  In accordance with the rationales stated in <u>Swint</u> and <u>Mancine</u>, this Court finds that the witnesses' prior statement were properly admissible here.

**B.  Assistance of Counsel**

Plaintiff asserts that his legal counsel was ineffective.

In order to succeed on an ineffective assistance of counsel claim, Petitioner must establish

---

(a)  Prior statements of witnesses. – A statement previously made by a person who is a witness at a trial or hearing, provided it would have been admissible if made by the declarant while testifying and the statement:

> (1) is inconsistent with the witness' testimony at the trial or hearing and is offered in compliance with Rule 613.  However, when the statement is offered by the party calling the witness, it is admissible only if, in addition to the foregoing requirements, it (A) is contained in a sound recording or in a writing made or signed by the witness in circumstances establishing its reliability or (B) was given under oath subject to the penalty of perjury at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in a deposition . . .

-16-

that (1) counsel's performance was deficient and (2) this inadequate representation "prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984); Williams v. Taylor, 529 U.S. 362, 390-1 (2000); Jacobs v. Horn, 395 F.3d 92, 102 (3rd Cir. 2005). "The error committed must be so serious as to undermine [the court's] confidence in the jury's verdict." State v. Sheika, 337 N.J. Super. 228, 242 (App. Div.), cert. denied, 169 N.J. 609 (2001). The yardstick for measuring any claim of ineffective assistance is whether counsel's decisions rendered the trial "fundamentally unfair or unreliable." Lockhart v. Fretwell, 506 U.S. 364, 369-370 (1993).

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington. Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct. See id. at 688-89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v. Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973 (2001). Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 688. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id.

A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689 (citations omitted); see also Virgin Islands v. Weatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

-17-

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance actually prejudiced his defense. <u>See</u> <u>Strickland</u>, 466 U.S. at 687. Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.  The reviewing court must evaluate the effect of any errors in light of the totality of the evidence.  <u>See id.</u> at 695-96.  Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim.  <u>See id.</u> at 697; <u>see also Jacobs</u>, 395 F.3d at 102.

With these principles in mind, the Court will consider each of Petitioner's ineffective assistance of counsel claims.

1.    <u>Trial counsel's failure to move to suppress illegally seized boots</u>

Petitioner argues that trial counsel was ineffective for failing to move to suppress boots that were seized from the petitioner's home.

The boots served to connect Petitioner to the Acura (which was one of the cars stolen by the various defendants in this case), as the boot print was found on the hood of the car.  Accordingly, Plaintiff was tied both to the stolen car, and to the scene of the robbery of Ms. James.   Law enforcement, after executing the first search, secured a second search warrant that authorized the seizure of "[f]ootwear worn by suspects on Saturday January 16, 1993 on or about 2:45 AM."  Law enforcement officials recovered two pairs of boots from the petitioner's residence.  Res. Br. at 34.

A search conducted pursuant to a warrant is presumptively legal.  <u>State v. Barron</u>, 214 N.J. Super. 46, 48 (App. Div. 1986), <u>cert. denied</u>, 107 N.J. 129 (1987), <u>cert. denied</u>, 484 U.S. 842 (1987). Accordingly, there is no indication here that a Fourth Amendment violation occurred, and therefore counsel did not act inappropriately by failing to object to the introduction of the boots.  Petitioner has not demonstrated "that his Fourth Amendment claim is meritorious" or, even if it were, "that there is a reasonable probability that the verdict would have been different absent the excludable

evidence." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).  Petitioner has not done so.

> 2.      Trial counsel's failure to investigate potential witnesses

Petitioner claims that his attorney should have called a number of individuals as witnesses. First, it defies logic that Petitioner's lawyer would secure the attendance of witnesses and then not present their testimony if he believed that their testimony would have been helpful.

As was explained in State v. Fritz, "[w]e can dispose of defendant's claim based on absent witnesses fairly easily. The witnesses have never been identified and their potential testimony has never been disclosed. The case law makes clear that such purely speculative deficiencies in representation are insufficient to justify reversal." 105 N.J. 42, 64 (1987).  Witness selection is entrusted to counsel's sound judgment. Government of Virgin Islands v. Weatherwax, 77 F.3d 1425, 1434 3rd Cir.), cert. den., 519 U.S. 1020 (1996).  "Attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case. Indeed, this is precisely the type of strategic decision which the Court in Strickland held to be protected from second-guessing." United States v. Ciancaglini, 945 F.Supp. 813, 823 (E.D. Pa. 1996).  Petitioner's speculation regarding the testimony of several witness does not state a cognizable claim under Strickland.

> 3.      Trial counsel's failure to object to the testimony of the State's forensic
>         chemist as being beyond allowable lay opinion

Petitioner asserts that counsel was ineffective for failing to object to the testimony of forensic chemist Joyce Polyniak ("Polyniak").   Polyniak provided testimony regarding boot print analysis that connected Petitioner to the crimes here.  Petitioner asserts that Polyniak's testimony was "well beyond allowable lay opinion."  Habeas Petition at 26.  Petitioner is incorrect.

First, "footprint identification is an area in which lay-opinion testimony is acceptable." State v. Johnson, 120 N.J. 263, 295 (1990) (noting that "[o]ther jurisdictions . . . have generally held that footprint identification does not require qualification of an expert, and [t]he rationale underlying

such decisions is that shoeprint patterns are often readily recognizable and well within the capabilities of a lay witness to observe.") (internal citations omitted); see also State v. Deluca, 325 N.J. Super 376, 393 (1999).[5]  For that reason, Petitioner's argument that his counsel's failure to object to the introduction of Ms. Polyniak's testimony tainted his trial is misplaced.[6]  Petitioner cites no case law holding otherwise.

Second, with respect to the lack of jury instruction as to Ms. Polyniak's proper role, Petitioner has not pointed to anything that indicates that the jury would believe Polyniak to be a "boot print" expert.

It is true, as Petitioner argues, that courts have been concerned that a jury might afford undue credit to a witness' testimony when he or she is presented as an expert.  See, e.g., Johnson v. White, 120 N.J. 263, 294-95 (1990).  Where a witness offers lay testimony, but the circumstances are such that a jury might infer that the witness is an expert, that witness' testimony may be impermissibly bolstered.  See id.  Petitioner asserts that this concern applies to Ms. Polyniak's testimony here.

As noted above, lay opinion testimony regarding boot print comparison is permissible. Frequently, however, it is a member of the police force that will present a side-by-side comparison of a defendant's boot print and a print found at the scene of the crime.  See, e.g., id.;  State v. Bruzzese, 94 N.J. 210, 215, 239, 463 A.2d 320 (1983) (similarity between footprint at crime scene

---

[5] The Court notes that the Johnson Court cautioned courts not to permit a fact witness to be impermissibly bolstered, such that the witness appears to a jury to be an expert.  120 N.J. at 294.  Here, however, there is no indication that the Government improperly presented Polyniak as an expert.

[6] Moreover, as Petitioner acknowledges, his counsel did raise the issue of Polyniak's testimony at a Rule 104 hearing.  The Court determined that Polyniak would not be permitted to testify as an expert of footprint analysis, but could appropriately offer lay opinion testimony. Petitioner asserts that counsel acted improperly by failing to object when the evidence was introduced while the jury was present.  Counsel's decision not to object to the testimony may very well have been an effective tactical decision—counsel knew that any such objection would be overruled in the presence of the jury, and accordingly declined to raise such an objection.

and shoe in the defendant's room discovered by police detective).  The mere fact that Ms. Polyniak is a forensic expert does not cause this Court to assume that her testimony was given undue credence.  See State v. Gerald, 113 N.J. 40, 53-54, 61, 549 A.2d 792 (1988) (medical examiner and state police forensic chemist testify to sneaker pattern similarities despite not being qualified as "footprint-identification experts"); see also Smith v. Bradshaw, 2007 U.S. Dist. LEXIS 71968 (N.D. Ohio Sept. 27, 2007), aff'd by, 591 F.3d 517 (6th Cir. Ohio 2010) (noting that medical experts' testimony comparing the weave-pattern of a pillow compared to marks on the face of the victim (who was asphyxiated), "were not elicited as expert testimony but were instead made in their capacity as lay witnesses.").

This case is unlike the Johnson, 120 N.J. at 294-95, cited infra, wherein the New Jersey Supreme Court determined that a witnesses lay testimony was impermissibly bolstered.  There, the Court qualified a witness as a "fingerprint-identification expert" and this witness also provided testimony regarding footprint analysis.   The Court was concerned that the witness' testimony was bolstered, as he "may have been qualified as a fingerprint expert for the primary purpose of bolstering the credibility of his footprint testimony."  Id.  Although Ms. Polyniak's scientific credentials were elicited at trial, she was not qualified as an expert for any purpose.  Here, the trial judge determined that Ms. Polyniak should not be qualified as an expert, and instead only permitted her to offer lay testimony.  The trial court generally instructed the jury that it was to determine the weight to be given to any testimony—be it lay opinion or expert testimony.  Moreover, when discussing expert opinion testimony, it only referenced the testimony of a Dr. Suarez (and made no mention of Ms. Polyniak).

In rendering its decision, this Court notes that even if Ms. Polyniak's testimony was disregarded in its entirely, it has not been "shown by a reasonable probability that the outcome would have been different."  Lockhart, 506 U.S. at 370; see, e.g., Farooq v. Russell, 2000 U.S. App. LEXIS 11426 (6th Cir. Ohio May 12, 2000) (denying petition for habeas corpus; finding no harm as "[t]here

was independent evidence presented at trial regarding [Defendant's] role in the murders; [the foot print] testimony simply added to the conflicting testimony that had already been presented to the jury[; f]urthermore [the expert] was available for cross-examination by [Defendant's] attorney."); Waters v. Kassulke, 916 F.2d 329, 335-36 (6th Cir. 1990).  The result of the trial was not unreliable because of the admission of Ms. Polyniak's testimony.[7]

The admission of Ms. Polyniak's testimony does not warrant granting Petitioner's petitioner for habeas corpus.

4.   Trial counsel's failure to request for instructions as to the lesser included offenses of aggravated manslaughter and/or manslaughter

Petitioner suggests that trial counsel erred by failing to request instructions for the lesser included offenses of aggravated manslaughter and/or manslaughter.

In this case, the evidence showed that the culprit walked up to the window of the car Burt was in, aimed the gun and shot her.  The facts, then, could not rationally support the two lesser included offenses, and "a jury instruction on lesser included offenses where the evidence does not support it."  Bishop v. Mazurkiewicz, 634 F.2d 724, 725 (3rd Cir. 1980), cert. den., 452 U.S. 917 (1981) (citation omitted).

Additionally, as the Government points out, Petitioner primarily relied on an alibi defense. Instructions on the lesser-included offenses may have actually weakened his alibi argument as inconsistent.  For instance, in State v. Vasquez, the Appellate Division held that the trial court properly did not instruct the jury on self-defense because it would have prejudicially interfered with the defense that someone else killed the murder victim.  As the Vasquez Court held:

---

[7] The Court notes, as did the State trial and appellate courts, that "the proof of guilt of the defendants [including Petitioner] was overwhelming, was corroborated by several witness . . . by identifications, by forensic evidence, and by the victims of the[] crime spree on that particular unfortunate evening."

Defendant denied playing any part in the victim's murder. His whole theory rested upon the premise that [the defendant's cousin] killed the victim.

Any charge on self-defense could have implied that the court believed the defendant and the victim engaged in a struggle. 265 N.J. Super. 528, 550 (App. Div.), certif. den., 134 N.J. 480 (1993).

Such an instruction, here, could very well have undermined the defense of alibi and that someone else committed the crime.

### C. Other Alleged Deficiencies at Trial & Sentencing

1.   Comments made by the prosecutor during his summations

Petitioner asserts that the prosecutor made improper comments during his summation.

A writ of habeas corpus will issue because of prosecutorial misconduct only if the prosecutor's actions "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Greer v. Miller, 483 U.S. 756, 765 (1987); Lam v. Kelchner, 304 F.3d 256, 271 (3rd Cir. 2002); Ramseur v. Beyer, 983 F.2d 1215, 1239 (3rd Cir. 1993), cert. den., 508 U.S. 947 (1993).

Here, the prosecutor stated that "the last word [that the petitioner should hear] is the word guilty. And he should hear that word 22 times. Once for each count of the indictment and once for each year of Bunny Burt's life that he took away from her family—from her, from everybody. Twenty-two times."

Next, the prosecutor asserted that the defense strategy was to "blame" Maing and Cobb for Petitioner's crimes.  Although "blame" may be a loaded term, Petitioner presented an alibi defense, so the comment was not entirely mischaracterizing.  Moreover, the trial court specifically gave an instruction to the jury with regard to the comment.

Petitioner has not pointed to any statements made by the Government that rise to the level of a denial of due process.

2.      Inconsistent verdicts returned by the jury

A defendant convicted by a jury on one count of the indictment cannot attack that conviction because it is inconsistent with the jury's acquittal of another count. Dunn v. United States, 284 U.S. 390, 393 (1932).  So long as there is sufficient evidence to sustain the conviction on the charge of which the petitioner has been found guilty, a reviewing court will not disturb the conviction.  United States v. Messerlain, 832 F.2d 778, 798 (3rd Cir. 1987), cert. den., 485 U.S. 988 (1988).  There was sufficient evidence supporting each of the crimes of which the jury found the petitioner guilty.[8]

3.      The sentence imposed by defendant was excessive and should be modified
        and reduced

Petitioner was convicted of felony murder, aggravated manslaughter, robbery and other counts, and received a life sentence, with a period of parole ineligibility.  Petitioner was sentenced to consecutive sentences for three separate indictments.  The incidents were separate, despite the fact that they were part of a larger crime spree.

Moreover, the severity of the charges, Petitioner's extensive record and a number of other aggravating factors justified an upward departure here.

## IV.  CONCLUSION

Petitioner's petition for habeas corpus is **denied** for the reasons set forth above, in addition to those discussed in this Court's Opinion of August 19, 2009.

The Order accompanying this Opinion will deny a certificate of appealability, based on the analysis of this Opinion.  However, Petitioner is advised that this Court's denial of a certificate of appealability does not prevent him from appealing this Court's decision, priovided he seeks a

---

[8] Petitioner asserts that the jury would have credited parts of a certain witness' testimony while disbelieving another portion.  This is not improper, and does not amount to an inconsistent verdict.  United States v. Vastine, 363 F.2d 853, 854 (3rd Cir. 1966).

-24-

certificate of appealability from the court of appeals.  <u>Kaufman v. Cameron</u>, 2010 U.S. Dist. LEXIS 55500, at *11  (M.D.Pa., June 7, 2010) (citing  28 U.S.C. § 2253).


 S/ Dennis M. Cavanaugh
Dennis M. Cavanaugh, U.S.D.J.

Date:          June  24 ,  2010
Orig.:         Clerk
cc:            All Counsel of Record
               File